IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

UNITED STATES OF AMERICA,      )
                         )
        Plaintiff,      )
                         )
vs.                       )         No. 09-20153-SHM-dkv
                         )
PRESTON WOODRUFF,        )
                         )
        Defendant.      )

---

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

---

Before the court is the January 21, 2010 motion of the defendant, Preston Woodruff ("Woodruff), to suppress all physical evidence, statements, or admissions obtained by law enforcement officers resulting either directly or indirectly from a traffic stop conducted on April 5, 2009, at the Kensington Manor Apartments near the intersection of Comanche and Getwell in Memphis, Tennessee, 38118. The government filed a timely response in opposition. The motion was referred to the United States Magistrate Judge for report and recommendation.

The court held and evidentiary hearing on May 4, 2010. At that hearing, the government called three witnesses, all of the Memphis Police Department ("MPD"): Detective Michael Britton, Detective Billy Jackson, and Sgt. Michael Rosario. The government also produced two exhibits: (1) A report from the Tennessee Department of Safety certifying that on the date of the search, the driving privileges of Cory Lee Fulford had been revoked ("Ex. 1");

and (2) the MPD's Tow-In Policy in effect at the time of the arrest ("Ex. 2").  The defendant testified on his own behalf and called one additional witness, Celestine Evans.  The defendant also produced two exhibits: (1) Detective Britton's arrest ticket ("Ex. 3"); and (2) the MPD's towing slip for Woodruff's vehicle.  After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be denied.

## PROPOSED FINDINGS OF FACT

On the evening of April 4, 2009 and the early morning hours of April 5, 2009, Detectives Michael Britton ("Detective Britton") and Billy Jackson ("Detective Jackson") (collectively "the detectives") were patrolling the area near the intersection of Comanche and Getwell roads in Memphis.  The government's first witness, Detective Britton, testified that at the time of the arrest the area surrounding the intersection was considered a "hot spot" for robberies of Hispanics, particularly at night.  The detectives were patrolling in an unmarked, dark tan, Dodge Charger, equipped with interior blue lights and two exterior spotlights located at the front of the vehicle.  The vehicle's windows were not tinted at that time.

Detective Britton testified that between approximately 11:00 p.m. and 12:00 a.m. that evening, the detectives were stopped at the light facing southbound on Getwell at its intersection with Comanche and saw the defendant Woodruff headed northbound on Getwell in a black 2003 Chevrolet Monte Carlo. From their position, the officers observed Woodruff run a red light while making a left hand turn into the entrance of the Kensington Manor Apartment complex located at the west end of Comanche Road. Detective Britton testified that no other vehicles were in front of or behind Woodruff's vehicle as Woodruff entered the turning lane and made the illegal left hand turn.

After witnessing Woodruff run the red light, the detectives activated their blue lights and effectuated a traffic stop of Woodruff's vehicle in the entrance to the apartment complex. Detective Britton testified that Kensington Manor Apartment complex was surrounded by wrought iron fencing, except for a single entry way located at the west end of Comanche Road. The entry way to the apartment complex consisted of two parallel lanes, one for ingress and one for egress. The two lanes were separated by a keypad used to activate the entry way gate, however, no gates were present at the time of the traffic stop.

Detective Britton stated that during the traffic stop, he used his patrol car's spotlight to look through the back window of Woodruff's vehicle and saw both the driver and passenger making

3

suspicious movements while leaning toward the middle of the vehicle. Due to his knowledge of the surrounding area and his observation of the vehicle's occupants' movements, Detective Britton wasted little time exiting his cruiser and approaching the driver's side of the vehicle. Detective Britton testified he asked the driver for identification, which he then scanned using his police-issued PDA device.

The scan revealed an outstanding warrant for Woodruff's arrest for aggravated robbery. The detectives immediately placed Woodruff under arrest upon learning of the warrant, patted him down, and placed him in the squad car. During the pat down of Woodruff, the detectives discovered three identification cards picturing Hispanic individuals and a social security card for an unidentified forth person. Detective Britton testified that when he asked Woodruff how he obtained identification cards, Woodruff explained that he found them in his vehicle. Subsequent to Woodruff's arrest, Detective Jackson approached Woodruff's passenger, Cory Lee Fulford ("Fulford"), and asked for Fulford's identification. Detective Jackson then detained Fulford after a check of Fulford's identification revealed that he was on Federal Supervised Release.

Detective Britton testified that the detectives then conducted a search of Woodruff's vehicle incident to his arrest. Underneath the passenger's seat, the detectives found a loaded chrome Lorcin L25, .25 caliber semi-automatic handgun with six (6) brass

Winchester rounds in the clip and one (1) in the chamber. In addition to the handgun, the detectives also found a maroon ski mask with holes cut into it and a Tennessee Lottery baseball cap with red Jamaican braids attached to it near the center console, four (4) cell phones in the trunk, and, various documents and pictures of Woodruff and Fulford throughout the passenger compartment of the vehicle. According to the MPD Towed/Recovered Report (Ex. 4), the Monte Carlo was towed to the vehicle impound lot at approximately 1:40 a.m.

Detective Britton testified that the detectives transferred both men to the MPD office located on Channel 3 Drive. Woodruff and Fulford were read their *Miranda* rights and both chose to give a statement to police. In his statement, Woodruff claimed to have found the handgun in the center console of his vehicle while driving and then placed it under the passenger seat. Fulford denied any knowledge of the weapon and was released without charge.

The next witness, Sergeant Michael Rosario ("Sgt. Rosario"), testified that at the time of Woodruff's arrest, he was serving as an officer in the MPD's Robbery division. Sgt. Rosario stated that the crime data available to the police at the time of the arrest showed that the area around the Kensington Manor Apartments was a hot spot for robberies of Hispanics and that the detectives patrol team had been deployed there on account of this information.

The defense called Celestine Evans. Evans testified that she owned the 2003 Monte Carlo driven by Woodruff. Evans stated that she is a resident of Memphis but was in North Dakota on a temporary work assignment at the time of Woodruff's arrest. Evans testified that she received a call from one of the detectives around 1 a.m. on the morning of Woodruff's arrest verifying that she was the owner of the vehicle driven by Woodruff. Evans stated that when she asked the detective on the phone about getting her car returned to her, she was told that it would be available to her at the impound lot. Evans stated that she had no further contact with the MPD until her return from North Dakota approximately five days later. According to Exhibit 4, the vehicle was released to Evans on April 8, 2009 at approximately 4:43 p.m.

Next to testify was Woodruff. In contrast to the testimony of the detectives, Woodruff testified that he did not make an illegal left turn into the Kensington Manor Apartment Complex on the night of this arrest. Rather, Woodruff testified that he was one of at least three vehicles that had pulled out into the intersection in the left turn lane under a yellow light and completed the left turn after the light had turned from yellow to red in order to clear the intersection. Woodruff also testified that he recognized the detectives' car as a police cruiser as he approached the intersection despite it being an unmarked vehicle and would therefore not have blatantly disregarded the traffic light in the

6

way that Detective Britton had described.  Woodruff also testified that after seeing the police cruiser activate its blue lights, he pulled his vehicle through the entrance to the apartment complex and parked in a designated parking spot.

The final witness to testify was Detective Billy Jackson.[1] Detective Jackson stated that the light at Comanche and Getwell had already turned red prior to the officers arriving at the intersection and that Woodruff ran the red light while making a left hand turn into the Kensington Manor Apartments.  On cross examination, Detective Jackson could not remember whether there were other cars in the general vicinity but was adamant that there were no other cars in the left turn lane and reiterated that Woodruff disobeyed the red light when turning into the apartment complex.  Detective Jackson also testified that Woodruff's vehicle came to a stop in the middle of the entrance to the apartment complex and not in a designated parking space, thus blocking the flow of traffic through that gate.

The court finds the testimony of the detectives to be credible and accepts their version of the events as fact.  Detective Jackson's testimony mirrored that of Detective Britton concerning

---

[1]    Detective Jackson was not called by the government during their case in chief, but rather as a rebuttal witness.  Prior to calling Detective Jackson on rebuttal, the government re-called Detective Britton.  Detective Britton's rebuttal testimony was consistent with his prior testimony during the government's case-in-chief.

the events surrounding the traffic stop and the arrest. Both officers testified that their patrol car arrived at the intersection of Getwell and Comanche first; that when they arrived the light was red; that the defendant's vehicle was not already out in the intersection before the light changed to red; and, that the defendant made an illegal left hand turn into the apartments. Finally, both officers also testified consistently that Woodruff's vehicle was stopped in the entry area to the apartment complex and not in a parking space as claimed by the defendant.

PROPOSED CONCLUSIONS OF LAW

Woodruff argues that he was stopped and detained without reasonable suspicion or probable cause.[2] He therefore contends that the government's warrantless search of his vehicle was unreasonable and in violation of his rights under the Fourth Amendment. Accordingly, Woodruff requests that the court suppress all evidence obtained during the search of his vehicle as well as any and all statements obtained as a result of the evidence obtained from the search as the "fruit of the poisonous tree."[3]

---

[2]   In his motion, Woodruff alleges that the passenger in his car, Fulford, was seized in violation of the Fourth Amendment and detained without reasonable suspicion or probable cause. Woodruff has no standing to assert any constitutional violation of Fulford's rights, See Alderman v. United States, 394 U.S. 165, 174 (1969), and any alleged violation of Fulford's rights is irrelevant to the current motion to suppress.

[3]   Woodruff reserved his right to file a supplemental suppression motion as to the statements based on discovery material received at the hearing.

A.   Stop and Arrest of Woodruff

The evidence presented at the hearing shows that the officers stopped Woodruff after observing him commit a traffic violation—disregarding a red light.   Thus, the officers had a reasonable, articulable suspicion that Woodruff was engaged in an unlawful activity and probable cause to stop the vehicle and detain Woodruff.   *See Whren v. United States*, 517 U.S. 806, 810 (1996); *see also Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").   After running his driver's license, the officers discovered that there was a two-month old outstanding warrant for Woodruff's arrest on aggravated robbery charges.   Thus, the officers had a lawful basis to arrest Woodruff, pat him down, and secure him in their squad car.   In addition, upon frisking Woodruff, the officers discovered multiple identification cards bearing Hispanic surnames.

B.   Search of the Vehicle

The critical issue is whether the subsequent warrantless search of Woodruff's vehicle was lawful pursuant to an exception to the Fourth Amendment's search warrant requirement.   The government contends that the search was justified as a search incident to arrest.   In the alternative, the government argues that the search

9

was justified under the automobile exception to the warrant requirement as well as the doctrine of inevitable discovery.

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.  The Fourth Amendment prohibits warrantless searches and seizures, and any search conducted without a warrant is considered "per se unreasonable." U.S. CONST. amend. IV; *United States v. Roarke*, 36 F.3d 14, 17 (6th Cir. 1994)(quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  The Fourth Amendment's requirement of probable cause and a warrant is, however, subject "to a few specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357.  The burden is on the government to prove, by a preponderance of the evidence, that the circumstances justified a warrantless search. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *United States v. Bradley*, 163 F. App'x 353, 357 (6th Cir. 2005) (unpublished).

1. Search Incident to Arrest

Woodruff argues that in light of the Supreme Court's decision in *Arizona v. Gant*, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009), his vehicle was not subject to a search incident to arrest because he was not in reaching distance of his vehicle at the time of his

10

arrest and "there was no reason to think his vehicle contained evidence of the offense of arrest" since the arrest was for an outstanding warrant.  (Def.'s Mot. 8.)

In *Gant*, the Supreme Court held that, incident to a lawful arrest, officers may conduct a warrantless search of an arrestee's vehicle and the containers therein only if there exists a "possibility that an arrestee could reach into the area that law enforcement officers seek to search," 129 S. Ct. at 1716, or if it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle," *id.* at 1719 (citing *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in judgment)).  Officers are justified in the first instance by the government's legitimate interest in officer safety and the preservation of evidence, *id.* at 1716, and in the second instance, by "circumstances unique to the vehicle context," *id.* at 1719.

The court agrees with the defendant that there was no possibility he could reach into the vehicle at the time of his arrest because he was secured in the squad car, and therefore the search of his vehicle was not justified under the first prong of *Gant*.  Therefore, the court must determine whether there was reason to believe the vehicle contained evidence of the offense of arrest.  According to the evidence presented at the hearing and the facts as found by the court, Woodruff was arrested pursuant to an outstanding warrant issued two months earlier in connection with a

robbery.   In addition, at the time of his arrest, identification documents of others was found on his person.  Because the basis for the arrest was a robbery and not a traffic violation, the issue under *Gant* is whether the officers had a reasonable basis to believe that the vehicle being driven by Woodruff may have contained evidence relevant to the crime of robbery.  The warrant was issued roughly two months prior to the time of Woodruff's arrest.   The government did not present evidence at the hearing that the detectives believed evidence relevant to the crime of robbery may be found in the vehicle driven by Woodruff, such as the vehicle was used in the robbery or that it was even his vehicle. Thus, the search incident to arrest was not valid under the second prong of *Gant*.   However, evidence relevant to other robberies and identity theft was found on Woodruff.  The unique circumstances of Woodruff's arrest as discussed in the next section would justify a search of the vehicle under *Gant*.

    2.   Automobile Exception

At the hearing, the government raised, as an alternative justification for the detectives' search of Woodruff's vehicle, the automobile exception to the warrant requirement.  The government takes the position that the information concerning robberies of Hispanics that the detectives had available to them at the time of the stop, the fact that the stop took place around midnight, and the discovery of identification cards bearing Hispanic surnames all

combined to create probable cause for Woodruff's arrest independent of his warrant and therefore justified the detectives' decision to search his vehicle.

An exception to the warrant requirement exists for the search of automobiles due to their mobility as well as the reduced expectation of privacy that comes with being in an automobile. *California v. Carney*, 471 U.S. 386, 390-391 (1985). A warrantless arrest must be supported by probable cause to be valid. *Wong Sun v. United States*, 371 U.S. 471, 479 (1963). Probable cause to conduct a warrantless arrest exists when officers have, at the moment of arrest, "facts and circumstances within their knowledge and of which they had reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964)(quoting *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)).

The probable cause necessary to support a warrantless arrest is no less than the probable cause required for issuance of an arrest warrant.  In other words, there must be probable cause to believe (1) an offense has been committed; and (2) the person to be arrested has committed it. *See* FED. R. CRIM. P. 4(a)(probable cause findings necessary to issue a warrant for an arrest).  Probable cause to search has been defined as "a fair probability that contraband or evidence of a crime will be found in a particular

13

place," *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Padro*, 52 F.3d 120, 122-23 (6th Cir. 1995).  Determination of probable cause is made by an analysis of "the totality of circumstances." *Gates*, 462 U.S. at 238; *Padro*, 52 F.3d at 122.

Here, an analysis of the totality of the circumstances surrounding the traffic stop and arrest supports a finding of probable cause to search Woodruff's vehicle.  The detectives testified that, at the time of the traffic stop, the area surrounding the Kensington Manor Apartments was known to police as a hot spot for robberies of Hispanics, particularly at night.  Detective Britton testified that he observed both the driver and the passenger making furtive movements as the detectives effectuated the stop.  A search of Woodruff's person revealed three identification cards bearing Hispanic surnames.  Given the nature of the area, the detectives' personal observations, and the discovery of the identification cards, the court finds that the detectives' decision to search Woodruff's vehicle was supported by probable cause.[4]  Because the detectives' search of Woodruff's vehicle was reasonable under the Fourth Amendment, the court finds no reason to suppress any of the physical or testimonial evidence

---

[4]     In finding probable cause to search the vehicle, the court neither relies on nor finds it necessary to address Woodruff's statement to the officers concerning the identification cards found in the car.

obtained by the detectives either directly or indirectly as a result of their search.

    3.   Inventory Search

The government also argues that the evidence would have been found during an inventory search following impoundment of the car and is therefore admissible under the inevitable discovery doctrine. *See United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995). An inventory search is an exception to the warrant requirement if the search is conducted pursuant to police policy. *Colorado v. Bertine*, 479 U.S. 367, 374 (1987); *South Dakota v. Opperman*, 428 U.S. 362, 372 (1976). Woodruff argues that the inventory search was not properly conducted pursuant to Memphis Police Department policy for two reasons: (1) the vehicle was located on private property; and (2) Fulford could have driven the vehicle from the scene. It is undisputed that the vehicle was impounded, an inventory search was performed, and the vehicle was towed to the MPD impound lot. (Ex. 4.) Because of the court's finding that the officers' search was justified by independent probable cause under the automobile exception to the warrant requirement, the issue of whether the officers conducted a proper inventory search is moot. Nevertheless, if it is necessary to consider the issue, the court recommends that the motion to suppress be denied on the basis of the inevitable discovery doctrine for the reasons that follow.

At the hearing, the government provided the court with documentary evidence that Fulford, Woodruff's passenger, did not have a valid driver's license at the time of the arrest (Ex. 1), as well as a copy of the MPD's policy on inventory searches which was in effect at the time of Woodruff's arrest (Ex. 2). Considering all of the evidence presented, the court finds that discovery of the handgun was inevitable under the circumstances. First, the Department of Transportation Report (Ex. 1) affirmatively negates Woodruff's claims that Fulford "could have easily driven the car from the scene" as it makes clear that Fulford's driving privileges were revoked on the date of the arrest. Second, the testimony elicited at the hearing shows that Woodruff's vehicle would have been towed and inventoried in accordance with the MPD policy in effect at the time. The policy in effect allowed arrestees to leave their vehicle only when: (1) it was legally parked on public property; (2) it was legally parked on private property and the owner of the property had given consent; or, (3) the arrestee authorized a third party who was not under arrest to legally park the vehicle. (Ex. 2, 3-4.). The testimony at the hearing showed that Woodruff's vehicle was on private property, not legally parked, and that no third parties were present that could have legally parked Woodruff's vehicle given that the vehicle's owner was in North Dakota at the time of the arrest and Woodruff's passenger, Fulford, was in police custody and did not possess a

valid license at that time.  Woodruff's car would have therefore been towed pursuant to the MPD's policies leading to the inevitable discovery of the handgun.  *See United States v. Vite-Espinoza*, 342 F.3d 462, 471 (6th Cir. 2003).

C.   *Miranda* Warning and Woodruff's Statement

Woodruff seeks to suppress his statement based on the fruit of the poisonous tree doctrine.  Woodruff has neither alleged a failure on the part of the officers to give a *Miranda* warning nor any coercion on the part of the officers.[5]  Having found the search valid, the court finds no basis on which to suppress Woodruff's statement.

### III.   RECOMMENDATION

For the reasons expressed above, it is recommended that the defendants' motion to suppress be denied.

Respectfully submitted this 13th day of May, 2010.

s/Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE

---

[5]   *See, supra,* note 3, at 8.