IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

───────────────────────────────────────────────

UNITED STATES OF AMERICA,            )
                                     )
          Plaintiff,                 )
                                     )
vs.                                  )          No. 09-20153-SHM-dkv
                                     )
PRESTON WOODRUFF,                    )
                                     )
          Defendant.                 )

───────────────────────────────────────────────

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS
───────────────────────────────────────────────

     The defendant, Preston Woodruff, has been charged in a one-count indictment with possessing a gun as a convicted felon on April 5, 2009 in violation of 18 U.S.C. § 922(g).  Before the court is the September 9, 2010 motion of Woodruff to suppress all oral and written statements made by him at the scene of his arrest or while in formal custody as being obtained in violation of his *Miranda* rights.   The government filed a timely response in opposition.   The motion was referred to the United States Magistrate Judge for report and recommendation.

     Woodruff filed an earlier suppression motion seeking to exclude all evidence, including statements, obtained by law enforcement officers in violation of his Fourth Amendment rights. The court held an evidentiary hearing on that motion and subsequently recommended in a Report and Recommendation filed May 13, 2010 that the motion to suppress be denied.  On July 9, 2010,

1

Woodruff timely filed objections to the factual findings and legal conclusions set forth in the May 13, 2010 Report and Recommendation.  Subsequently, Woodruff filed the present motion to suppress.  By order dated December 20, 2010, the district judge deferred ruling on Woodruff's objections until a report and recommendation is submitted and objections, if any, are filed with respect to the present motion.

A limited evidentiary hearing was held on March 24, 2011 to receive any additional evidence related to the present motion to suppress.  At that hearing, the government called two witnesses with the Memphis Police Department ("MPD"): (1) Detective Michael Britton with the Organized Crime Unit ("OCU") and (2) Sergeant Michael Rosario with the Robbery Squad.  The defense did not call any witnesses to testify.  The parties introduced a total of three exhibits into evidence: (1) Statement of Woodruff taken by Detective Britton on April 7, 2009 (Ex. 1); (2) MPD Arrest Record (Ex. 2); and (3) Advice of Rights Form and Statement of Woodruff, taken by Detective Rosario on April 7, 2009 (Ex. 3).  On the defendant's motion, the March 24, 2011 hearing was continued in order for Woodruff to introduce any supplemental evidence.

On April 18, 2011, the court re-opened the proof to receive additional evidence regarding the present motion to suppress.  The defense called two additional witnesses: (1) Lieutenant Debra Oliver-Hammons, the record-keeper at the Shelby County Jail; and

(2) Lieutenant Paul Wright, Jr. with OCU.  The government called Detective Britton and Sergeant Rosario back to the stand to testify.  The parties introduced five additional exhibits: (1) the Detective Check Out Log from the Shelby County Jail (Ex. 4); (2) seven pages from the Shelby County Jail Log Book (Ex. 5); (3) Detective Rosario's Robbery Supplement (Ex. 6); (4) the April 5, 2009 Advice of Rights Form (Ex. 7); and (5) the April 5, 2009 Robbery Supplement (Ex. 8).

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be denied.

## I.   PROPOSED FINDINGS OF FACT

### A.   Woodruff's First and Second Statements

The court adopts and incorporates herein its previous proposed Findings of Fact.  As previously found:

> On the evening of April 4, 2009 and the early morning hours of April 5, 2009, Detectives Michael Britton ("Detective Britton") and Billy Jackson ("Detective Jackson") (collectively "the detectives") were patrolling the area near the intersection of Comanche and Getwell roads in Memphis.  The government's first witness, Detective Britton, testified that at the time of the arrest the area surrounding the intersection was considered a "hot spot" for robberies of Hispanics, particularly at night.
> \* \* \*
> Detective Britton testified that between approximately 11:00 p.m. and 12:00 a.m. that evening, the detectives were stopped at the light facing southbound on

3

Getwell at its intersection with Comanche and saw the
defendant Woodruff headed northbound on Getwell in a
black 2003 Chevrolet Monte Carlo.

\* \* \*

[A]fter witnessing Woodruff run the red light, the
detectives activated their blue lights and effectuated a
traffic stop of Woodruff's vehicle in the entrance to the
apartment complex. Due to his knowledge of the
surrounding area and his observation of the vehicle's
occupants' movements, Detective Britton wasted little
time exiting his cruiser and approaching the driver's
side of the vehicle. Detective Britton . . . asked the
driver for identification, which he then scanned using
his police-issued PDA device.

The scan revealed an outstanding warrant for
Woodruff's arrest for aggravated robbery. The detectives
immediately placed Woodruff under arrest upon learning of
the warrant, patted him down, and placed him in the squad
car. During the pat down of Woodruff, the detectives
discovered three identification cards picturing Hispanic
individuals and a social security card for an
unidentified forth [sic] person. . . . [W]hen [Detective
Britton] asked Woodruff how he obtained identification
cards, Woodruff explained that he found them in his
vehicle. [1]

\* \* \*

---

[1]   Specifically, Officer Britton testified as follows:

Q.   Okay. Now when you found the IDS in Mr. Woodruff's pocket-
A.   Yes, ma'am.
Q.   -could you indicate what type of individuals or what
     nationality or race of individuals were depicted on these
     cards?
A.   They were Hispanics.
Q.   Okay.  Did you say anything about that fact"
A.   I asked him whose Ids these were and why did you have them.
     He advised me that he found them on the seat of his car and he
     just put them in his pocket.
Q.   Okay.  So he said he found them in the car.
A.   Yes, ma'am.
Q    Did you interpret that he meant the car that he just got out
     of?
A.   Yes, ma'am.

(Tr. Pp. 21-22.)

4

The detectives then conducted a search of Woodruff's vehicle incident to his arrest. Underneath the passenger's seat, the detectives found a loaded chrome Lorcin L25, .25 caliber semi-automatic handgun with six (6) brass Winchester rounds in the clip and one (1) in the chamber. In addition to the handgun, the detectives also found a maroon ski mask with holes cut into it and a Tennessee Lottery baseball cap with red Jamaican braids attached to it near the center console, four (4) cell phones in the trunk, and, various documents and pictures of Woodruff and Fulford throughout the passenger compartment of the vehicle. According to the MPD Towed/Recovered Report (Ex. 4), the Monte Carlo was towed to the vehicle impound lot at approximately 1:40 a.m.

[T]he detectives transferred both men to the MPD office located on Channel 3 Drive. Woodruff and Fulford were read their *Miranda* rights and both chose to give a statement to police. In his statement, Woodruff claimed to have found the handgun in the center console of his vehicle while driving and then placed it under the passenger seat.

The next witness, Sergeant Michael Rosario ("Sgt. Rosario"), testified that at the time of Woodruff's arrest, he was serving as an officer in the MPD's Robbery division. Sgt. Rosario stated that the crime data available to the police at the time of the arrest showed that the area around the Kensington Manor Apartments was a hot spot for robberies of Hispanics and that the detectives patrol team had been deployed there on account of this information.

The court finds the testimony of the detectives to be credible and accepts their version of the events as fact.

(D.E. No. 47 at 3-5.) The statement made by Woodruff at the scene of the arrest will be referred to as "the first statement."

In addition, the court finds the testimony of all witnesses offered in the evidentiary hearing on March 24, 2011 and April 18, 2011 to be credible and accepts their version of the events as facts. In the hearing conducted on April 18, 2011, Detective Britton and Sergeant Rosario testified consistently with their previous testimony given on March 24, 2011 and provided additional

information regarding Woodruff's statements.

Detective Britton testified that the events leading up to the arrest of Woodruff began about 11:55 p.m. on Saturday, April 4, 2009 and that he would have patted down and questioned Woodruff about the Hispanic identification cards within ten minutes of the stop and arrest of Woodruff that night.  Following Woodruff's arrest, Britton and Jackson transported Woodruff to the OCU office between 2:00 a.m. and 3:00 a.m., Sunday morning, April 5, 2009. Detective Britton also testified that Lieutenant Paul Wright made the scene of the arrest before Woodruff and Fulford were transferred to the OCU office on Channel 3 Drive.

At the OCU office, Lieutenant Wright informed the officers that he had previously dealt with Woodruff and Fulford regarding a 2005 robbery, that their nicknames were Dinosaur and Gorilla, and that they were involved in robberies of Hispanics.  Woodruff was placed in an interview room and detained by leg shackles. Detective Britton testified that he advised Woodruff of his *Miranda* rights orally and in writing and briefly questioned him before he began typing out Woodruff's statement at 3:55 a.m., Sunday morning, April 5, 2009.  This statement will be referred to as "the second statement."  Woodruff's second statement consists of three typed pages and provides that it is "relative to the weapons violation complaint filed against Woodruff." (Ex. 1.)  The second statement consists of twenty-eight separate questions.  (*Id.*)  The questions

primarily concerned the handgun and other belongings found in the Monte Carlo that Woodruff was driving. (*Id.*)  Detective Britton asked Woodruff one question about the identification cards: "Why were the identification cards of Daniel Jimmenez Juan San Rafael [sic], Victor Garcia, and Roberto Adorno found in you [sic] pocket?" (*Id.*)  In response, Woodruff stated "They were on [sic] driver seat so I picked them up and put them in my pocket." (*Id.*) Woodruff also stated that his girlfriend, Celestine Evans, owned the Monte Carlo he was driving.  (*Id.*)

B.   Woodruff's Third Statement

The government's second witness, Sergeant Rosario, was assigned to the Robbery squad at the time in question and was the lead investigator for robberies of Hispanics.  Sergeant Rosario testified that he arrived at work on Sunday, April 5, 2009 at 8 a.m. and read an email sent from Lieutenant Wright at 8:12 a.m. The email stated that Woodruff had been arrested and found in possession of Hispanic identification cards.  Lieutenant Wright also informed Sergeant Rosario that Woodruff worked on a two-man team with Fulford and that they were known for robbing Hispanics. Sergeant Rosario ran a robbery report, but no report regarding the robbery of Hispanic victims was located.[2]

---

[2]     According to Sergeant Rosario, some officers take handwritten reports, which take longer to enter the system than those taken on PDAs.  The robbery report of stolen Hispanic identification cards had not yet entered the system when he checked on April 5, 2009.

According to his Robbery Supplement, Sergeant Rosario called the jail at 201 Poplar at approximately 12:53 p.m. that afternoon, Sunday, April 5, 2009, for a detective's visit with Woodruff. (Ex. 8.)   At 1:30 p.m., Sergeant Rosario and Sergeant Winston transferred Woodruff from the jail to the Robbery Office located on the 11th floor at 201 Poplar. (*Id.*) Woodruff declined something to drink and advised the officers that he had been served lunch. (*Id.*) Sergeant Rosario testified that he reminded Woodruff that he had been advised of his rights earlier that morning by Detective Britton and advised Woodruff that the rules still applied. Sergeant Rosario then conducted a broad questioning of Woodruff, advising Woodruff that they were interested in any information on robberies that he may or may not have been involved in.

According to Sergeant Rosario, Woodruff stated that he was on supervised federal release and provided the name of a known robber, Tony Bone. (Ex. 8.) Woodruff also provided information regarding the murder of a male known as Geno. (*Id.*) Woodruff stated that he was driving his girlfriend's vehicle when he was pulled over on April 4, 2009 and denied any involvement in a robbery. (*Id.*) He also informed Sergeant Rosario that the check-making materials found in the car were from an arrest made years ago. (*Id.*) Woodruff stated that he was given the Hispanic identifications from a dark-skinned female named Rolanda, whom he had met through Nicole Merden. (*Id.*) Sergeant Rosario showed Woodruff a picture of

8

Rolanda Garrett, and Woodruff identified her as the individual that gave him the identification cards. (*Id.*) According to the jail check out log and Sergeant Rosario's Robbery Supplement, Woodruff was signed back into the jail at 5:25 p.m that evening with "no visible injuries." (Ex. 4 & 8.) Woodruff's oral statement, given between 1:30 p.m. to 5:25 p.m. on Sunday afternoon April 5th, will be referred to as "the third statement."

C.   Woodruff's Fourth Statement

Sergeant Rosario further testified that during roll call the next day, Monday, April 6, 2009 at 8:00 a.m., he was assigned a case involving a robbery of Hispanics.[3]  The Hispanic victims were the same individuals whose identification cards had been found on Woodruff.  On Tuesday, April 7th, between 9:59 a.m. and 3:15 p.m., Sergeant Rosario met with the victims and showed them a photo lineup.  Woodruff was positively identified.

Later on Tuesday, April 7th, Sergeant Rosario called for another detective's visit with Woodruff.  Woodruff was transported from the jail to the Robbery Office, detained in an interview room, and provided with an Advice of Rights form.  Woodruff was orally advised his *Miranda* rights, and he signed the Advice of Rights Form at 5:16 p.m., indicating that he wished to make a statement. (Ex. 3.) Sergeant Rosario conducted a brief question and answer session

---

[3]     The robbery report had now been entered into the system, and Sergeant Rosario started his case file on Woodruff.

with Woodruff before he began typing Woodruff's statement at 6:04 p.m. Woodruff's four-page statement states it is "relative to the Robbery Complaint filed by Juan Candelaria which occurred at 6015 Littlebrook Circle North #112 on April 4, 2009." (*Id.*) In his statement, Woodruff admitted to participating in the robbery of Juan Candelaria and other Hispanics on April 4, 2009, at approximately 11:05 p.m. (*Id.*) Woodruff stated that he was armed with a small caliber chrome gun which he got of the car he was driving and that the car belonged to his girlfriend, Celestine Evans. (*Id.*) When asked what was taken in the robbery, Woodruff replied that he took some identification cards and put them in his pocket. (*Id.*) Woodruff read his statement and signed it at 6:43 p.m. (*Id.*) This statement will be referred to as "the fourth statement."

On Wednesday, April 8, 2009, Sergeant Rosario called the jail at 12:10 p.m. for a detective's visit. (Ex. 5.) At 12:50 p.m., Sergeant Rosario called again. (*Id.*) However, due to a code change at the jail, Sergeant Rosario did not visit with Woodruff. (*Id.*) Woodruff was transferred within the jail to have his fingerprints taken at 5:30 p.m by Sergeant Bobby Jones. (Ex. 4.)

## II.   PROPOSED CONCLUSIONS OF LAW

In the present motion, Woodruff's sole ground upon which he seeks to suppress his statements is the lack of *Miranda* warnings

prior to his first statement at the scene of the arrest.[4] *Miranda v. Arizona*, 384 U.S. 436 (1966). Woodruff argues that because the first statement was obtained in violation of *Miranda*, all subsequent statements are tainted, even those made with *Miranda* warnings.

*Miranda* requires that before a person in custody is questioned, he be advised of his Fifth Amendment right to remain silent, that anything he says may be used against him, and that he has a right to have an attorney, either retained or appointed, present during interrogations. *Miranda,* 384 U.S. at 444. If the defendant is not informed of these rights, any pretrial statement obtained in a custodial interrogation is presumed coerced and inadmissible at trial in the government's case in chief. *Oregon v. Elstad*, 470 U.S. 298, 317 (1985).

The clear rule is that "[w]hen police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the [government's] case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317 (1985). The "right" to *Miranda* warnings is not constitutionally mandated. *Michigan v. Tucker*, 417 U.S. 433, 444 (1974). Rather,

---

[4] In his earlier motion, Woodruff also sought suppression of the statements as fruits of the poisonous tree from an alleged Fourth Amendment violation which this court has recommended denying.

the warnings are intended as a prophylactic mechanism to safeguard against the inherently coercive effects of in-custody interrogation which threaten the Fifth Amendment privilege. *New York v. Quarles*, 467 U.S. 649, 654 (1984).

*Miranda* warnings are required only when a suspect is in custody and subject to interrogation. *Miranda* defined custody as the "[deprivation] of...freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "Interrogation" means "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980).

It is undisputed that Woodruff was in custody at the time he made the first statement regarding the identification cards found in the automobile he was driving. The officers asked Woodruff whose identification cards they were and why he had them. Woodruff answered that he found them on the seat of his car and put them in his pocket. Although it is a close call, the officers' questions could be construed as reasonably likely to elicit incriminating information and therefore could be construed as interrogation. It is undisputed that no *Miranda* warning had been provided to Woodruff at the time. It is also undisputed, however, that Woodruff's response was not incriminating and was not a confession because Woodruff lied to the officers about where he got the identification cards. Nevertheless, the first statement is inadmissible.

The critical issue is whether Woodruff's subsequent statements

are therefore rendered tainted by the first unwarned statement. Woodruff argues that two Supreme Court decisions, *Missouri v. Seibert*, 542 U.S. 600 (2004) and *Oregon v. Elstad*, 470 U.S. 298 (1985), mandate that the three post-*Miranda* statements should be suppressed.

In *Elstad*, the Supreme Court, in refusing to exclude a second post-*Miranda* statement even though the initial pre-*Miranda* statement was inadmissible, held that "absent deliberately coercive or improper tactics in obtaining the initial statement," a post-*Miranda* statement was not automatically excluded. *Elstad*, 470 U.S. at 314. Rather, the Supreme Court instructed lower courts to "examine the surrounding circumstance and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Id.* at 318.

The Supreme Court revisited *Elstad* nine years later in *Seibert*. *Seibert* was a plurality decision in which Justice Kennedy filed an opinion concurring in the judgment that the defendant's statements should be suppressed. 542 U.S. 600. In *Seibert*, the police interrogated the defendant for 30 to 40 minutes, obtained a confession, took a 20 minute break, returned and gave *Miranda* warnings, and then continued to question the defendant about her pre-*Miranda* statements to get her to repeat the confession. *Id.* at 604-05. The Court held that the mid-interrogation warning did not comply with *Miranda's* constitutional warning requirement because

13

the interrogation was nearly continuous and the warnings were intentionally withheld in order to procure a confession. *Id.* at 617.

The *Seibert* plurality developed the following five factor test to determine whether giving a *Miranda* warning mid-interrogation would be effective: (1) the completeness and detail involved in the first round of interrogation; (2) the overlapping content of the statements made before and after the warning; (3) the timing and setting of the interrogations; (4) the continuity of police personnel; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. *Id.* at 615. Justice Kennedy, however, rejected the plurality's test and concluded that a mid-interrogation warning is not effective if the police deliberately evade *Miranda* and do not take curative measures. *Id.* at 622 (Kennedy, J., concurring). If the police are not deliberately attempting to evade *Miranda*, then Justice Kennedy stated that the voluntariness test of *Elstad* applies. *Id.*

Because the Supreme Court divided 4-1-4 in *Seibert*, there is confusion over whether the plurality or Justice Kennedy's opinion controls. The Sixth Circuit has analyzed cases under both tests. *See United States v. Pacheco-Lopez*, 531 F.3d 420, 427 n.11 (6th Cir. 2008). Woodruff contends that it is unnecessary for this court to decide which test controls because the post-*Miranda* statements are inadmissable under all three tests: *Seibert's*

14

plurality test, *Seibert's* concurrence, and the *Elstad* test.  The
government argues that an analysis of the facts under these tests
indicate that the post-*Miranda* statements are admissible.  The
court will look at all three tests when determining whether
Woodruff's subsequent statements should be suppressed.

A.   <u>Admissibility of Woodruff's Second Statement</u>

Woodruff's second statement was taken by Detective Britton at
the OCU office located on Channel 3 Drive at 3:55 a.m. on Sunday,
April 5, 2009, approximately three to four hours after his first
statement was given.   *Miranda* warnings were administered
immediately before his second statement was made.

Under *Seibert's* plurality test, four of the five factors weigh
in favor of admissibility of Woodruff's second statement.   The
first factor, the completeness and detail involved in the first
round of interrogation, weighs in favor of admissibility because
the initial question, i.e. the first statement, consisted only of
asking Woodruff  "whose IDs these were and why did [he] have them."
When Woodruff replied that he found them in the car and put them in
his pocket, the officers did not pursue any additional questions
about the identification cards.   Thus, Woodruff provided very
little detail and the interrogation was very limited.

The second factor, the overlapping content of the pre-*Miranda*
statements and post-*Miranda* statements, also weighs in favor of
admissibility. The only overlapping content in Woodruff's first

statement at the scene of his arrest and his second statement at
the OCU office on Channel 3 Drive was that he found the
identification cards in his girlfriend's car and put them in his
pocket.  During the first statement at the arrest scene, Woodruff
was not asked about the gun.  The officers had not even found the
gun when they asked Woodruff about the identification cards found
in his pocket.  The majority of Woodruff's second statement
consisted of Woodruff informing the officers about the handgun.
There was only one question and response related to the
identification cards.

As to the third factor, the timing and setting of Woodruff's
statements differed drastically.  Woodruff's first statement was
taken at the apartment complex, a little after midnight on Sunday
morning, April 5, 2009.  At least three hours later, Woodruff made
the second statement at the OCU office on Channel 3 Drive.

The fifth factor, the continuity of questioning, also weighs
in favor of admissibility.  At the scene of the arrest, the
officers did not ask Woodruff about the gun and asked only one
question about the identification cards.  The main focus of the
officers questions in the second round was the handgun that they
found on Woodruff.  Plus, several hours had passed between the
first question at the scene and the later questioning at the OCU
office.  Thus, the second round of questioning cannot be viewed as
a continuation of the first question.

The fourth factor, the continuity of police personnel, is the only factor that weighs against admissibility.  Woodruff gave his first and second statements to the same police officers, Detectives Britton and Jackson.

Four of the five *Seibert* factors demonstrate that *Miranda* warnings were effective.  As a result, the court finds that Woodruff's second post-*Miranda* statement is admissible under *Seibert's* plurality test.

Under *Seibert's* concurrence, whether Woodruff's post-*Miranda* statements are admissible depends on whether the officers deliberately evaded *Miranda* and took no curative measures.  The defense argues that the fact officers were a special unit, investigating Hispanic robberies, indicates that the question about the identification cards without *Miranda* warnings was deliberate. The court disagrees.  Just after asking Woodruff for identification, the officers found Woodruff in possession of identification cards that were clearly not his.  Questioning whose identification cards they were and where he got them is logical. While this question may have elicited incriminating evidence, the court does not believe the officers engaged in a deliberate strategy to get Woodruff to confess to everything he knew about the robbery of Hispanics.  If this were the officers' intent, they would have asked Woodruff additional follow-up questions.  Instead, the officers waited over three hours, transported Woodruff to a new

location, read him his rights, and then asked him the same question again about the identification cards. Again, the officers did not ask any additional questions about the cards. Because the court finds that the officers were not deliberately evading *Miranda*, Kennedy's concurrence directs the court to apply the voluntariness test of *Elstad*.

Under *Elstad*, the Supreme Court instructed lower courts to "examine the surrounding circumstance and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." Here, the detectives immediately placed Woodruff under arrest upon learning that Woodruff had an outstanding warrant for aggravated robbery. The officers patted him down, and they placed him in the squad car. During the pat down, the detectives discovered the identification cards and asked about them. There is no evidence that the officers coerced Woodruff into confessing. In fact, Woodruff did not confess that he had robbed Hispanics of their identification cards; Woodruff only told the officers that he found the identification cards in his girlfriend's car and put them in his pocket. When the officers asked him again about the IDs at OCU, Woodruff gave the same answer. Although Woodruff was detained, he was given restroom breaks and there was no evidence that the officers threatened him. Viewing the surrounding circumstances and the entire course of the police conduct, the court finds that Woodruff's second statement is

admissible under the *Elstad* test.

Accordingly, regardless of whether the *Seibert* plurality or concurring opinion controls, the court finds that the mid-interrogation *Miranda* warning was effective, and the second statement is admissible.

B.   <u>Admissibility of Woodruff's Third Statement</u>

Woodruff made the third statement to Sergeant Rosario on Sunday, April 5, 2009, at 1:30 p.m., more than nine hours after the second statement was made.   Woodruff did not sign a waiver of rights form before giving his third statement; however, Sergeant Rosario reminded Woodruff that he had been advised of his rights earlier that morning by Detective Britton and advised him that the rules still applied.

Under the *Seibert* plurality test, the court finds at least three factors weigh in the favor of admissibility and therefore Sergeant Rosario's oral reminder of Woodruff's *Miranda* rights was effective.

The first factor, the completeness and detail involved in the first round of interrogation, weighs in favor of admissibility.   As previously stated, the first statement consisted of only question about the identification cards.   While the second statement consisted of twenty-eight separate questions, the questions primarily concerned the handgun and other belongings found in the Monte Carlo that Woodruff was driving.   The officers only asked one

question about the Hispanic identification cards.

The second factor weighs weighs partially against admissibility. There was little overlapping content of the second and third statements but there was some overlap between the first and third statement. As stated above, the majority of Woodruff's second statement consisted of Woodruff informing the officers about the handgun, and there was only one question and response related to the identification cards in which Woodruff told the officers he found in the car and put them in his pocket. In his third statement, Woodruff told Sergeant Rosario that he had no involvement in the robberies, did not mention anything about a firearm, and stated that he received the Hispanic identification cards from a female named Rolanda. Woodruff also provided Sergeant Rosario with information regarding other people's criminal activities. However, because the first statement was so limited, there is very limited overlap between the first and third statements.

The third factor also weighs in favor of admissibility. The third statement was taken over nine hours after the second statement and over fourteen hours after the first statement. Additionally, the setting of the statements changed. The first statement was taken at the scene of the arrest, the second statement was taken at the OCU office on Channel 3 Drive, and the third statement was taken at the Robbery Office located at 201

Poplar.

The fourth factor is satisfied because there was no continuity of police personnel. Detective Britton and Lieutenant Wilson took Woodruff's first and second statement while Sergeant Rosario took the third statement.

Finally, the fifth factor, the degree to which the interrogator's questions treated the second round as continuous with the first, partially weighs against admissibility. During the third interrogation, Sergeant Rosario did not provide Woodruff with an additional Advice of Rights form. Sergeant Rosario testified that he reminded Woodruff that he'd been advised of his *Miranda* rights earlier that morning and advised him that the rule still applied. Although he relied on the previous Advice of Rights form, Sergeant Rosario testified, however, that the third interrogation was not part of the ongoing traffic stop investigation.

Three out of the five *Seibert* factors demonstrate that *Miranda* warnings were effective. As a result, the court finds that Woodruff's third post-*Miranda* statement is admissible under *Seibert's* plurality test.

Under *Seibert's* concurrence, the inquiry turns on whether the officers deliberately evaded *Miranda* and took no curative measures during Woodruff's third interrogation. There is no evidence that Sergeant Rosario was involved in a plan or scheme to get Woodruff to confess. Sergeant Rosario had nothing to do with the first or

second statements. The third statement took place approximately
nine hours after Woodruff made his second statement. Although
Sergeant Rosario did not have Woodruff sign another Advice of
Rights form, he clearly reminded Woodruff of his rights and told
him that the rules still applied while he was questioning him. As
such, the court finds that Sergeant Rosario was not deliberately
evading *Miranda* and thus the court will turn to the *Elstad*
voluntariness test.

The court comes to the same conclusion under the *Elstad* test.
There is no evidence that the police coerced Woodruff into making
confessions. As stated above, the officers merely asked Woodruff
a logical question after finding Hispanic IDs on him. They
immediately stopped their questioning and did not resume until
several hours later, after Woodruff was orally advised of his
rights and given an Advice of Rights form. Further, Sergeant
Rosario repeated his rights as soon as he sat down with Woodruff.

Accordingly, the court finds that Woodruff's third statement
is admissible.

C. Admissibility of Woodruff's Fourth Statement

Woodruff made his fourth statement to Sergeant Rosario on
April 7, 2009, at approximately 6 p.m. in the Robbery Office at 201
Poplar. Immediately before typing the fourth statement, Woodruff
signed an Advice of Rights form. The fourth statement was made
over two and half days after his initial pre-*Miranda* statement was

made and over two days after his third post-*Miranda* statement was made.  In his fourth statement, Woodruff admitted to the robbery.

Under the *Seibert* plurality test, the court finds that the mid-interrogation *Miranda* warnings were effective.  Although Sergeant Rosario was detailed in his questioning of Woodruff during the third interrogation, Woodruff did not actually "let the cat out of the bag" until over two days later at the fourth interrogation. There is no overlapping content of the statements that Woodruff made before and after the *Miranda* warnings.  Woodruff initially stated that he found the identification cards on the seat of the car and then changed his story in his third statement to say that he received the identification cards from a female named Rolanda. In his fourth statement, Woodruff confessed to robbing Juan Candelaria and other Hispanics.  He also admitted to carrying a firearm and taking the identification cards from Hispanics. Although Sergeant Rosario conducted both the third and fourth interrogations at the same location, the court finds that the timing of the interrogations weighs heavily in favor of admissibility and that Sergeant Rosario did not treat the fourth round as continuous with the third.  The third statement was taken on April 5th at 1:30 p.m.  Sergeant Rosario did not question Woodruff again until two days later on April 7th at 6 p.m., after Woodruff was read his *Miranda* rights again and received an Advice of Rights form.  As such, the court finds that Woodruff's fourth

23

statement is admissible under *Seibert's* plurality.

Whether Woodruff's fourth statement is admissible under *Seibert's* concurrence depends on whether the officers deliberately evaded *Miranda* and took no curative measures. The court is not persuaded that the officers were involved in a scheme to intentionally evade *Miranda*. Woodruff was read his *Miranda* rights on three different occasions and was provided with two separate Advise of Rights forms. The officers allowed time to pass between each interrogation, they did not question Woodruff extensively, they reminded Woodruff of his rights each time, and they changed up the subject of the interrogations. Because the court finds that the officers were not deliberately evading *Miranda*, the court will apply the voluntariness test of *Elstad*.

Viewing the entire course of police conduct, from the first interrogation to the fourth, the court finds that Woodruff's statements were voluntarily made. The court has already determined that the second and third statements were made voluntarily. Woodruff made no allegations that Sergeant Rosario threatened him during the fourth interrogation. In fact, Sergeant Rosario testified that Woodruff freely explained that "times were hard" and that he participated in the robbery because he needed money to pay a drug debt. Woodruff was only questioned for a short period of time during the fourth interrogation. Woodruff signed the Advice of Rights form at 5:14 p.m. and signed his written statement at

6:43 p.m., indicating that the questioning was over.

Accordingly, the court finds that the mid-interrogation *Miranda* warning was effective, and Woodruff's fourth statement is admissible.

### III.   RECOMMENDATION

For the reasons expressed above, it is recommended that Woodruff's motion to suppress be denied in part and granted in part. The court recommends that Woodruff's motion to suppress the first statement be granted, and the motion to suppress all subsequent statements made at the OCU office on Channel 3 Drive and at the Robbery Office at 201 Poplar be denied.

Respectfully submitted this 20th day of June, 2011.

s/Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE