## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,     ) | |
|      ) | |
|     Plaintiff,     ) | |
|      ) | |
| v.     ) | Case No. 09-20153 |
|      ) | |
| PRESTON WOODRUFF,     ) | |
|      ) | |
|     Defendant.     ) | |

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORTS AND RECOMMENDATIONS AND DENYING DEFENDANT'S MOTIONS TO SUPPRESS

Before the Court are Defendant Preston Woodruff's ("Woodruff") January 21, 2010 Motion to Suppress (Mot. to Suppress and Supporting Mem., ECF No. 31 ("First Mot. to Suppress")) and September 9, 2010 Motion to Suppress (Mot. to Suppress Statements and Supp. Memorandum, ECF No. 61 ("Second Mot. to Suppress")), along with the objections to Magistrate Judge Diane K. Vescovo's Reports and Recommendations that Woodruff filed on June 29, 2010, and August 18, 2011, respectively. (Def.'s Objections to the Magistrate's Report and Recommendation on Def.'s Mot. to Suppress, ECF No. 55 ("First Objection"); Def.'s Objections to the Magistrate's Second Report and Recommendation on Defendant's Second Mot. to Suppress, ECF No. 115 ("Second Objection").) The United States responded to Woodruff's objections on September 29, 2011. (Resp. to Def.'s

Obj. to the Magistrate Judge's Reports Recommending Denial of the Def.'s First and Second Mots. To Suppress, ECF No. 119 ("Govt.'s Resp.").)

The Magistrate Judge recommended that the Court deny both of Woodruff's Motions to Suppress. (Report and Recommendation on Defendant's Mot. to Suppress, ECF No. 47 ("First Report"); Report and Recommendation on Def.'s Mot. to Suppress, ECF No. 107 ("Second Report").) Woodruff's objections are not well taken. The Court ADOPTS the Reports and Recommendations of the Magistrate Judge. The Motions to Suppress are DENIED.

## I.  Procedural and Factual Background[1]

On the evening of April 4, 2009, and during the early morning hours of April 5, 2009, Detectives Michael Britton ("Detective Britton") and Billy Jackson ("Detective Jackson") (collectively "the Detectives") were patrolling the area near the intersection of Comanche and Getwell roads in Memphis, Tennessee. The Detectives had been assigned to that area because it was considered a "hot spot" for robberies of Hispanics, particularly at night. Between 11:00 p.m. and 12:00 a.m., the Detectives saw Woodruff head north on Getwell through a red light while making a left turn into the Kensington Manor Apartment Complex. The Detectives conducted a traffic stop of

---

[1] All facts are taken from the Magistrate Judge's Proposed Findings of Fact unless otherwise noted. (First Report 2-8; Second Report 3-10.) The Proposed Findings of Fact provide context. Woodruff's factual objections are addressed in the Analysis.

2

Woodruff's vehicle outside the Kensington Manor Complex. During that stop, Detective Britton used his patrol car's spotlight to look through the rear window of Woodruff's vehicle. Britton saw the driver and passenger making suspicious movements. Detective Britton asked Woodruff for identification, which Britton then scanned using a portable computer that he has referred to as a PDA (Britton, 5/04/2010 Suppression Hearing Tr. 20, ECF No. 74.) The scan revealed that Woodruff had an outstanding arrest warrant for aggravated robbery. The Detectives immediately placed Woodruff under arrest, patted him down, and placed him in the squad car. During the pat down, the Detectives discovered three IDs picturing Hispanic individuals (the "IDs") and a social security card for an unidentified fourth person. When Detective Britton asked Woodruff how he had obtained the IDs (the "First Interrogation"), Woodruff explained that he had found them in his vehicle (the "First Statement").

The Detectives then conducted a search of Woodruff's vehicle incident to his arrest. The search revealed a chrome Lorcin L25 .25 caliber semi-automatic handgun loaded with six Winchester rounds in the clip and one in the chamber. The Detectives also found a maroon ski mask with holes cut into it, a Tennessee Lottery baseball cap with red Jamaican braids attached to it, photos of Woodruff and Woodruff's passenger, Cory Lee Fulford, and four cell phones. Woodruff was

transferred to the Memphis Police Department office on Channel 3 Drive.

When the Detectives arrived at the office, Lieutenant Wright informed them that Woodruff and Fulford had been involved in a 2005 robbery, that their nicknames were Dinosaur and Gorilla, and that they had participated in several robberies of Hispanics. Detective Britton interrogated Woodruff in an interview room after giving him his <u>Miranda</u> rights orally and in writing and provided Woodruff with an Advice of Rights Form (the "Second Interrogation"). Woodruff chose to give a statement, in which he repeated the claim that he had found the IDs in his car (the "Second Statement").

Woodruff was later interviewed by Sergeant Rosario ("Sergeant Rosario"), an officer assigned to the Robbery Squad at the time of Woodruff's arrest and the lead investigator for robberies of Hispanics. Sergeant Rosario interrogated Woodruff on April 5, 2009, at 1:30 p.m (the "Third Interrogation").[2] Before the Third Interrogation, Sergeant Rosario reminded Woodruff that he had been advised of his rights earlier that morning and that they were still in effect.

Woodruff said he was on supervised federal release and provided the name of a known robber and information about a

---

[2] At the time Sergeant Rosario interviewed Woodruff, no robbery report had been filed for the IDs.

murder and denied any involvement in a robbery. Woodruff claimed he had received the IDs from a dark-skinned female named Rolanda and identified her from a photograph (the "Third Statement"). The interview ended at 5:25 p.m., and Woodruff was returned to his cell with no visible injuries.

Sergeant Rosario testified that on April 6, 2009, at 8:00 a.m., he was assigned to investigate a robbery of Hispanics. The victims were the same individuals whose IDs had been found on Woodruff. On Tuesday, April 7, 2009, Sergeant Rosario met with the victims and showed them a photographic lineup. The victims identified Woodruff. Based on this information, Sergeant Rosario interrogated Woodruff again. Woodruff was orally advised of his Miranda rights and signed the Advice of Rights Form at 5:15 p.m., after saying he wished to make a statement (the "Fourth Interrogation").

Woodruff admitted the robbery of the Hispanics whose identity cards had been stolen and said he had been armed with a chrome gun he had found in the car. He reiterated that the car belonged to his girlfriend. Woodruff signed his statement at 6:43 p.m (the "Fourth Statement").

Woodruff has been charged with possession of a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). (Indictment, ECF No. 1.) The firearm

alleged is the Lorcin L25 .25 caliber semiautomatic handgun found in the vehicle he was driving on April 5, 2009. (Id.) Woodruff has filed two motions in which he seeks to suppress "any and all physical evidence" obtained "as a direct or indirect result" of the traffic stop on April 5, 2009 (First Mot. to Suppress 2) and "any and all statements taken from him at the scene of the arrest and subsequently given while in formal custody." (Second Mot. to Suppress 2.)

The Magistrate Judge has recommended that the Court deny both Motions to Suppress. (First Report; Second Report.) Woodruff has filed two objections. In the first, he contends that the Detectives' testimony was incredible, that he was stopped and detained without reasonable suspicion or probable cause, and that the warrantless search of his vehicle was unreasonable and violated his Fourth Amendment rights. (See First Objection.) In the second objection, Woodruff contends that the motion to suppress his Statements should be granted because the police violated his Miranda rights. Miranda v. Arizona, 384 U.S. 436 (1966); (See Second Objection).

**II. Standard of Review**

A "district judge must determine de novo any part of a magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)(C). After reviewing the evidence, the court is free to accept, reject, or

6

modify the proposed findings or recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). "It is well-settled that upon proper objection by a party, a district court must review de novo a magistrate judge's ruling on a motion to suppress." United States v. Quinney, 238 F. App'x 150, 152 (6th Cir. 2007) (citations omitted). The district court need not review, under a de novo or any other standard, those aspects of a magistrate judge's report and recommendation to which no specific objection is made. See Thomas v. Arn, 474 U.S. 140, 149-50 (1985); United States v. Robinson, 352 F. App'x 27, 28-29 (6th Cir. 2009).

"When a magistrate's findings and recommendations rest upon the evaluation of the credibility of a witness, the district court is not required to rehear the testimony in order to conduct a de novo determination of the issues." United States v. Bermudez, No. 99-6097, 2000 U.S. App. LEXIS 33159, at *8-9 (6th Cir. Dec. 11, 2000) (citing United States v. Raddatz, 447 U.S. 667, 675-76 (1980)). "Credibility determinations of the magistrate judge who personally listened to the testimony . . . should be accepted unless in [its] de novo review of the record [the district court] finds a reason to question the magistrate judge's assessment." United States v. Johnson, No. 10-20176, 2011 U.S. Dist. LEXIS 97577, at *6-7 (W.D. Tenn. Aug. 30, 2011) (citations omitted).

### III. Analysis

Woodruff contends that: 1) the Magistrate Judge's factual findings about the circumstances surrounding the traffic stop are erroneous because the Detectives' testimony was contradictory (First Objection 3-8); 2) there was no reasonable suspicion to justify an investigative traffic stop (Id. 8); 3) the automobile exception does not apply because the only basis to search Woodruff's car was a statement that should have been excluded, and the inventory search exception does not apply (Id. 9); 4) the Magistrate Judge's factual findings about the Interrogations are erroneous because Sergeant Rosario could not recall how many times he had spoken with Woodruff and the Magistrate Judge found that Woodruff had received a Miranda warning when he had not (Second Objection 4); and 5) all of Woodruff's Statements to the police should have been excluded under Miranda. (Id. 5.)

#### A. Factual Objections in the First Objection

Woodruff objects to the Magistrate Judge's finding that the Detectives were credible based "solely on the fact that they testified consistent with one another." (First Objection 3.) The Magistrate Judge accepted the Detectives' testimony because "Jackson's testimony mirrored that of [Britton] concerning the events surrounding the traffic stop and the arrest." (First Report 7.) The Magistrate Judge noted that:

Both officers testified that their patrol car arrived at the intersection of Getwell and Comanche first; that when they arrived the light was red; that the defendant's vehicle was not already out in the intersection before the light changed to red; and that the defendant made an illegal left hand turn into the apartments. Finally, both officers also testified consistently that Woodruff's vehicle was stopped in the entry area to the apartment complex not in a parking space as claimed by the Defendant.

(First Report 7-8.)

Woodruff contends that there "is an insufficient basis upon which to find that the [Detectives] were credible and that [Woodruff's] version of the events was not credible." (First Objection 3.) He objects to the Magistrate Judge's findings of credibility because "there were conflicts in the testimony between the Government witnesses and there were also conflicts between the Government's witnesses and the testimony of the Defense witnesses that the Magistrate Judge failed to resolve." (First Objection 4.) Woodruff identifies contradictions about who was driving the Detectives' vehicle (Id. 4), argues that Detective Britton's description of how Woodruff's vehicle passed the Detectives' vehicle is impossible (Id. 5), and asserts an inconsistency in the Detectives' testimony about where Woodruff stopped. (Id. 6.) These contentions are without merit.

Woodruff cites the transcript to identify conflicts, but the transcript makes clear that there are no material contradictions. Woodruff first contends that "Detective Britton

testified that he was driving . . . [but] [l]ater . . . Detective Jackson testified that he was driving." (First Objection 4.) Detective Britton did testify that "[he] was driving" the vehicle. (Detective Britton, 5/04/2010 Suppression Hrg. 20, ECF No. 74.) Detective Jackson's statement, however, was made in response to a question by Woodruff's counsel about whether Jackson had noticed traffic coming through the intersection at Getwell and Comanche. (Id. 99.) Detective Jackson responded that he "wasn't paying any attention." (Id.) When pressed by counsel, Detective Jackson testified that "you just don't look straight when you're driving. So, I [wasn't] paying any attention." (Detective Jackson, 05/04/2010 Suppression Hrg. 100.) This statement is ambiguous; Detective Jackson could have meant that he was driving the vehicle or that he was merely a passenger. It would require a strained reading to conclude, as Woodruff suggests, that Detective Jackson meant he routinely does not look straight ahead while driving a car. Jackson's statement more plausibly means that, when he is a passenger in a car, he does not pay close attention and "just [doesn't] look straight." (Id.)

Even if the testimony were inconsistent, the "alleged inconsistency" "bear[s] only on [a] collateral fact[]." United States v. Miller, 413 F. App'x 841, 843 (6th Cir. 2011). See also United States v. Clark, 136 F. App'x 831, 835-36 (6th Cir.

2005) (finding collateral inconsistencies irrelevant when material statements were consistent). Woodruff asks the Court to find that "nothing [the officers] said was credible because a few of the minor details . . . were arguably inconsistent." United States v. Craig, 198 F. App'x 459, 465 (6th Cir. 2006).

Woodruff's contention that "Detective Britton's version of the events regarding where the vehicles were located is a factual impossibility" is also unavailing. (First Objection 5.) Woodruff contends that Detective Britton testified that the Detectives' vehicle was in the far right lane and that Woodruff's vehicle passed directly in front of it to enter the Kensington Manor Apartment Complex. (First Objection 6.) Woodruff contends that Britton's testimony "is not credible," because his description would require Woodruff's vehicle to "go[] directly against oncoming traffic." (Id.) Detective Britton testified that the Detectives were driving south on Getwell, with the Kensington Apartments on their right. (Detective Britton, 5/04/2010 Suppression Hr'g 16.) He testified that Woodruff's car was travelling north on Getwell and "turned in front of [him]." (Id. 16-17.) Detective Britton's testimony is credible. To make a left turn into the Kensington Manor Apartment Complex while driving north on Getwell, Woodruff's automobile had to pass in front of cars driving south on Getwell. There is no physical impossibility in Britton's

testimony, and nothing incredible about suggesting a car turned in front of the Detectives when it made a left turn into the apartments.

Woodruff also contends that the Detectives' testimony is inconsistent about where Woodruff's vehicle stopped. (First Objection 6.) That argument is not well taken. Detective Britton described the location of the stop as an entry driveway into the Kensington Manor Apartment Complex and testified that there is a "center section [in the driveway] with a keypad." (Detective Britton, 5/04/2010 Hr'g 18.) Detective Britton testified that Woodruff "stopped directly in that . . . . It was pretty much blocking traffic inside the apartment[s]." (Id. 18-19.) Detective Jackson testified that Woodruff stopped "right past the keypad." (Id. 92.) Detective Jackson's testimony corroborates Detective Britton. Detective Jackson testified that Woodruff's car blocked the exit and that it was in the middle of the road. (Id. 93.) The Detectives described the same location, but used slightly different wording. Any inconsistencies "relate to collateral facts; they do not undermine [the] consistently material testimony." Clark, 136 F. App'x at 834; see also United States v. Robinson, 78 F. App'x 501, 504 (6th Cir. 2003) (finding officers' testimony "consistent in all relevant respects.").

Woodruff asserts inconsistencies that are minor at best. The testimony here is consistent in all material respects. Courts may conclude that the "consistency of two officers' accounts" indicates that their statements are credible. United States v. Garrido, 476 F.3d 971, 979 (6th Cir. 2006); see also United States v. Simmons, 174 F. App'x 913, 917 (6th Cir. 2006) (finding officers' testimony credible because it was substantively consistent); United States v. Craft, 150 F. App'x 413, 416 (6th Cir. 2005) (finding officers credible because they "testified consistently, one with the other."). The officers testified consistently about the time and location of the arrest (5/04/2010 Suppression Hr'g 83-5, 91-4.) They testified that Woodruff drove through the intersection at Getwell and Comanche before the light turned red and illegally turned into the apartment complex. (Id. 15-16, 89-90.) They testified consistently that Woodruff's vehicle was stopped in an entry to the complex. (Id. 17-19, 92-93.) Their testimony is credible.

Woodruff's contention that the officers did not have a reasonable suspicion to justify an investigative traffic stop depends on his claim that there was a "clearly erroneous finding of fact that [Woodruff] made a left turn." (First Objection 8.) That claim is not well taken. The officers had a reasonable, articulable basis to stop Woodruff; they saw him violate a traffic law. "A police officer may effect a traffic stop of any

13

motorist for any traffic infraction." United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2001). "[A] roadside detention is lawful so long as the officer has probable cause to believe that the motorist violated the traffic laws." Garrido, 2006 U.S. App. LEXIS 27695, at *14.

Woodruff has shown no basis in the record to "set aside credibility determinations made by the trier of fact, who has had the opportunity to view the witness on the stand and assess his demeanor." Peveler v. United States, 269 F.3d 693, 702 (6th Cir. 2001); see also Moss v. Hofbauer, 286 F.3d 851, 868 (6th Cir. 2002). Because the record contains "no compelling reason to second-guess the Magistrate Judge's decision," her credibility determinations must stand. United States v. Freeman, 412 F. App'x 735, 743 (6th Cir. 2010). The initial stop was not unlawful.

### B. The Search of Woodruff's Vehicle

Woodruff contends that the search of the automobile he was driving was unconstitutional because that search was the product of an involuntary statement. (First Objection 9.) Woodruff also contends that the Magistrate Judge implicitly relied on Woodruff's statement to the police to determine probable cause. (Id. 10-11.) Finally, Woodruff contends that the inventory exception does not apply and that there was no inevitable discovery because the true owner of the car, Celestine Evans

("Evans"), was not given a chance to have the vehicle retrieved from the scene.[3]  (Id. 13.)

The Fourth Amendment guarantees the right to be secure "against unreasonable searches and seizures," U.S. Const. amend. IV, and any search without a warrant is "per se unreasonable." United States v. Pearce, 531 F.3d 374, 379 (6th Cir. 2008) (quoting United States v. Roark, 36 F.3d 14, 17 (6th Cir. 1994)).  Warrantless searches of vehicles incident to arrest are justified when it is reasonable to believe that relevant evidence will be found in the vehicle, or when there is a legitimate concern for officer safety.  Arizona v. Gant, 129 S. Ct. 1710, 1717-20 (2009).  The Magistrate Judge concluded that that officer safety did not justify a search of Woodruff's automobile because "he was not within reaching distance of his vehicle at the time of his arrest."  (First Report 10-11.) Thus, under Gant, there was no legitimate safety concern.  Gant, 129 S. Ct. at 1723-24.

In its response, the Government contends that, even if the search were unconstitutional under Gant, it would be admissible under the good-faith exception.  (Govt.'s Resp. 8.)  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that the exclusion can meaningfully deter it . . . .

---

[3] The Magistrate Judge noted that Evans was in North Dakota at the time of the arrest.  (First Report 16.)

[E]vidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may be properly charged with knowledge, that the search was unconstitutional.'" Herring v. United States, 555 U.S. 135, 144 (2009) (quoting Illinois v. Krull, 480 U.S. 340, 348-349 (1987)). As the Government notes, Woodruff's arrest took place on April 5, 2009, and Gant was not decided until April 21, 2009.

Before Gant, "[t]he Sixth Circuit was among the legion of courts" that allowed "a vehicle search incident to the arrest of a recent occupant even if there was no possibility that the arrestee could gain access to the vehicle at the time of the search." United States v. Buford, 632 F.3d 264, 274 (6th Cir. 2011) (internal quotations omitted). In Buford, the Sixth Circuit upheld a search that was constitutional before Gant, but unconstitutional afterward. The court concluded that "'penalizing the officer for the court's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.'" Id. at 276 (quoting United States v. Leon, 468 U.S. 897, 920-21 (1984)). Because the Sixth Circuit has held that evidence from a search conducted before Gant and lawful under Sixth Circuit authority at the time should not be excluded, the good-faith exception applies to the search here.

Even without relying on the good-faith exception, the automobile exception, as the Magistrate Judge noted, would have

allowed a search.  (First report 12.)  The automobile exception

allows police to search an automobile if they have probable

cause to believe it contains evidence of criminal activity.

United States v. Ross, 456 U.S. 798, 807-8 (1982).  Woodruff

does not dispute that the automobile exception would apply if

probable cause existed, but contends that there was no probable

cause to search his vehicle.  (First Objection 10.)  The

Magistrate Judge concluded that there was probable cause because

the area was known to police as a hot spot for robberies of

Hispanics, the driver and passenger were observed making

suspicious movements during the stop, and a search of Woodruff's

person produced three IDs bearing Hispanic surnames.  (First

Report 14.)

Woodruff contends that the Magistrate Judge's finding of

probable cause is erroneous because, subjectively, the

Detectives relied on Woodruff's statement that he found the IDs

in the car.  (First Objection 10.)  Detective Britton testified

that, when he searched Woodruff and found the IDs in his pocket,

Britton could tell that the cards belonged to Hispanic

individuals.  (Detective Britton, 05/14/2010 Suppression Hr'g

21-22.)  Britton asked Woodruff "whose IDs [they] were and why

did [he] have them.  He advised [Detective Britton] that he

found them on the seat of his car and he just put them in his

pocket."  (Id. 22.)  Woodruff contends that this statement was

involuntary under United States v. Patane and that all evidence in the car must be suppressed. 542 U.S. 630 (2004). According to Woodruff, even if the Court does not exclude the evidence on the basis of Patane, the Detectives relied on his involuntary statement in determining probable cause and the evidence should be excluded. Neither argument is well taken.

In Patane, the Supreme Court held that "the core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal to testify against himself at trial." 542 U.S. at 637. Holding that "a mere failure to give Miranda warnings does not, by itself, violate a suspect's constitutional rights or even the Miranda rule," the Supreme Court noted that "'[t]he exclusion of unwarned statements . . . is a complete and sufficient remedy' for any perceived Miranda violation." Id. at 641 (quoting Chavez v. Martinez, 538 U.S. 760, 790 (1994)). The court concluded found that introduction of the physical fruits of a Miranda violation "does not implicate the Self-Incrimination Clause." Patane, 542 U.S. at 643.

Woodruff contends that his statement was involuntary, but provides no evidence to support that contention. (First Objection 9.) To determine whether a statement is involuntary, courts look to "the totality of the circumstances." United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999). Three factors affect the voluntariness of a statement: whether "(i)

18

the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." Id.

There is no evidence that Woodruff was coerced into explaining where the IDs came from; rather, he voluntarily stated he had found them in the car. There is no indication that his will was overborne. His initial explanation was exculpatory and later recanted, suggesting he was acting of his own free will. Nor is there any evidence that the failure to give a Miranda warning was the crucial factor motivating Woodruff's statement. "The use of a single handcuff does not support finding that the defendant's will was overborne." United States v. Stokes, 631 F.3d 802, 809 (6th Cir. 2011). Absent evidence of coercion, the evidence in the car is admissible.

Woodruff next contends that the officers used his involuntary statement to determine probable cause and that, without that statement, there would have been no probable cause to search his vehicle. (First Objection 10.) Probable cause is "an objective standard," not a subjective one. United States v. Cooper, 1 F. App'x 399, 403 (6th Cir. 2001). Probable cause considers whether "the facts and circumstances within the officer's knowledge [] are sufficient to warrant a prudent

person, or one of reasonable caution" to believe "that the suspect has committed, is committing, or is about to commit an offense." <u>Michigan v. DeFillippo</u>, 443 U.S. 31, 37 (1979). "Probable cause requires only the probability of criminal activity, not some type of 'prima facie' showing." <u>Jollye v. Harvell</u>, 254 F. App'x 483, 486 (6th Cir. 2007).

The facts demonstrate that the officers observed suspicious movement on the part of a suspect who possessed several IDs belonging to Hispanic individuals in a neighborhood where Hispanics were prone to be robbed. Taken together, these facts alone establish probable cause to search the vehicle for evidence of robbery. Having found evidence of criminal activity, there was "a fair probability that contraband or evidence of a crime" would be found in the vehicle Woodruff was driving. <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).

Grounds to search Woodruff's automobile also existed under the inevitable discovery doctrine because the police would have been allowed to perform an inventory search. <u>Colorado v. Bertine</u>, 479 U.S. 367, 374 (1987). Woodruff contends that the car's owner, Evans, "was not given a chance, under the Memphis Police Department's Towing Policy, to have the vehicle retrieved by someone from the scene." (First Objection 13.)

"In order to be valid, inventory searches must be conducted 'according to standard police procedures' and may not be

undertaken 'for the purposes of investigation.'" United States
v. Lilly, No. 10-1798, 2011 U.S. App. LEXIS 18429, at *8-9 (6th
Cir. September 1, 2011) (quoting United States v. Lumpkin, 159
F.3d 983, 987 (6th Cir. 1998)).  Woodruff does not contend that
the police failed to follow standard police procedures.  Indeed,
he could not because, as the Magistrate Judge noted, "Woodruff's
vehicle [c]ould have been towed and inventoried in accordance
with the [Memphis Police Department] policy."  (First Report
16.)  Woodruff contends that the Detectives were under a duty to
inform Evans that the individual driving her vehicle had been
arrested, to wait with the vehicle until she called someone to
pick it up and that someone had arrived, and then to give that
person the keys to the vehicle.  (First Objection 12.)

     Woodruff cites no authority, and this Court finds none, to
support this new requirement.  To the contrary, police need only
show "at least one ground for impoundment."  Lilly, 2011 U.S.
App. 18429, at *12.  Woodruff does not dispute that his vehicle
was blocking traffic and that it could not have been left where
it was. There does not need to be "a determination of whether
there was in fact a need . . . to impound the [vehicle]; instead
we are required to determine whether . . . the decision to
impound was reasonable under the circumstances." United States
v. Nagle, 892 F.2d 489, 494 (6th Cir. 1989).  When an inventory
search is conducted "pursuant to a reasonable and mandatory

police department practice," it is constitutional. United States v. Ballard, No. 10-3180, 2011 U.S. App. LEXIS 16072, at *9 (6th Cir. Aug. 3, 2011). Because "the gun . . . would have inevitably been found during the inventory search," there was no error to justify the use of the exclusionary rule. United States v. Vite-Espinoza, 342 F.3d 462, 471 (6th Cir. 2003).

### C. Factual Objections in the Second Objection

Woodruff "asserts that there is an insufficient basis upon which to find that the witnesses were credible." (Second Objection 4.) Woodruff objects to the Magistrate Judge's determination about Sergeant Rosario's credibility and contends that Rosario was not credible because he did not recall whether he had spoken to Woodruff one or two times until Rosario was shown Woodruff's detention records at the April 18, 2011 suppression hearing. (Id. 4; Sergeant Rosario, 4/18/2011 Suppression Hr'g 55-56, ECF No. 98.) Sergeant Rosario testified in March that he had informed Woodruff, during Woodruff's Third Interrogation, that his Miranda rights still applied. (Sergeant Rosario, 3/24/2011 Suppression Hr'g 65-67, ECF No. 99; Second Report 8.) Sergeant Rosario also testified in March that he had orally advised Woodruff of his Miranda rights before the Fourth Interrogation and had him sign an Advice of Rights Form. (Sergeant Rosario, 3/24/2011 Suppression Hr'g 73-74; Second Report 9.)

22

Woodruff argues that Sergeant Rosario is not credible because he could not recall specifically whether he had talked to Woodruff more than once after Woodruff's arrest. It was not until the April 18, 2011 hearing, when records were introduced showing that Sergeant Rosario had spoken to Woodruff twice, that Sergeant Rosario recalled speaking on two occasions. (Second Objection 4; sergeant Rosario 4/18/2011 Supression Hr'g 65.)

This Court is "'both statutorily and constitutionally required' to engage in a de novo review" of Sergeant Rosario's credibility. United States v. Burcham, 388 Fed. App'x 478 (quoting United States v. Worley, 193 F.3d 380, 383 n.6 (6th Cir. 1999)). After reviewing the record, and recognizing that "a magistrate judge is in the better position to assess the credibility of witnesses he sees and hears," there is no reasonable basis to question Sergeant Rosario's credibility. United States v. Robinson, No. 1:07-CR-1, 2007 U.S. Dist. LEXIS 53290, at *1 (E.D. Tenn. July 23, 2007).

Sergeant Rosario testified in depth about the circumstances surrounding his interrogation of Woodruff and the robbery office's standard operating procedures. (Sergeant Rosario 4/18/2011 Suppression Hr'g 53, ECF No. 98.) Woodruff attacks Sergeant Rosario for refreshing his recollection based on a report he wrote during Woodruff's Third Interrogation. Courts have traditionally allowed witnesses to refresh their

recollection; indeed, the Federal Rules of Evidence explicitly provide for it. See Fed. R. Evid. 612 (allowing a witness to refresh his recollection based on any document provided to him) & Fed. R. Evid. 803(5) (allowing a witness to testify and read from a memorandum or record "made or adopted by the witness when the matter was fresh in the witness' memory and [] reflect[ing] that knowledge correctly." Woodruff does not argue that the report on which Sergeant Rosario relied was inaccurate or unreliable. Sergeant Rosario testified, and Woodruff does not dispute, that the record was sufficiently detailed to document "the times that [Woodruff] was offered water or restroom breaks" during the Third Interrogation. (Sergeant Rosario, 4/11/2011 Suppression Hr'g 64, ECF No. 98.)

Sergeant Rosario is an officer with the Memphis Police Department who handles a significant case load. (Id. 73:17-21.) More is required than his reliance on his records to "substitute our judgment for the credibility determination of the magistrate judge." Moss, 286 F.3d at 868.

Woodruff's argument that he was not properly given Miranda warnings before his Third Statement is also unavailing. (Second Objection 4-5.) The Magistrate Judge found that Sergeant Rosario reminded Woodruff that his Miranda rights were still in effect, and Woodruff does not contest this. (Second Report 8.) Sergeant Rosario testified that he "reminded [Woodruff] of [his

Miranda] rights verbally and advised him that [they] still applied" (Sergeant Rosario, 4/18/2011 Suppression Hr'g 63.)  The Supreme Court has never "dictated the words in which the essential information [Miranda requires] must be conveyed." Florida v. Powell, 130 S. Ct. 1195, 1204 (2010).  Sergeant Rosario's statement to Woodruff that his Miranda rights still applied reasonably conveyed to Woodruff "his rights as required by Miranda."  Duckworth v. Egan, 492 U.S. 195, 203 (1989) (internal quotation omitted).  Woodruff does not contend that he invoked his right to remain silent after the Second Interrogation.  There was no violation of his constitutional rights.

### D.  The Admissibility of Woodruff's Statements

The Magistrate Judge concluded that Woodruff's First Statement, that he found the Hispanic IDs in his car, was excludible because it was "undisputed that Woodruff was in custody at the time." (Second Report 12.)  Recognizing that "it is a close call," the Magistrate Judge held that "the officers' questions could be construed as reasonably likely to elicit incriminating information and therefore could be construed as interrogation."  (Id. 12.)  The Government contends that the Detectives merely conducted a reasonable inquiry (Govt. Resp. 9), but it does not dispute that Woodruff was under arrest when questioned.  The Supreme Court has explicitly held that

25

custodial interrogations occur when "questioning [is] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." Oregon v. Mathiason, 429 U.S. 492, 295 (1977) (internal quotations omitted). To qualify as an interrogation, a statement must be reasonably likely to elicit incriminating information. Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Not every question police officers ask will constitute an interrogation, but any "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response" amount to interrogation. Id. at 301-02.

After Woodruff had been arrested, Detective Britton asked him how he had obtained the IDs. (Detective Britton, 3/24/2011 Suppression Hr'g 21.) That is not the sort of "casual conversation" that does not rise to the level of interrogation. United States v. Thomas, 381 F. App'x 495, 502 (6th Cir. 2010). Nor is it the sort of administrative concern, such as a defendant's name, address, height, or weight, that might permit questioning without a Miranda waiver. United States v. Pachecho-Lopez, 531 F.3d 420, 423 (6th Cir. 2008). Detective Britton effectively asked Woodruff why he was carrying other people's IDs after arresting him for a previous robbery. Britton "should have known" his question "[was] reasonably

26

likely to elicit an incriminating response." <u>Innis</u>, 446 U.S. at 302. Woodruff's First Statement is inadmissible because it was the product of a custodial interrogation without a <u>Miranda</u> warning.

Woodruff contends that the Second, Third, and Fourth Statements are inadmissible under <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), and <u>Oregon v. Elstad</u>. 470 U.S. 298 (1985).

In <u>Elstad</u> and <u>Seibert</u> the Supreme Court considered the consequences of providing <u>Miranda</u> warnings after custodial interrogation had begun. In <u>Elstad</u>, officers interrogated the defendant without informing him of his <u>Miranda</u> rights, and the defendant confessed to robbery. <u>Elstad</u>, 470 U.S. at 300-301. Approximately one hour later, after the defendant had been transported to a police station, officers read him his <u>Miranda</u> rights and interrogated him again. <u>Id.</u> at 227. The court decided that the first statement was inadmissible, but the second was admissible. <u>Id.</u> at 305-07. The Supreme Court established a two-step test: whether the first, pre-<u>Miranda</u> statement was coerced, and if so, "whether that coercion has carried over into the second confession." <u>Elstad</u>, 470 U.S. at 310. When a statement is "unwarned but clearly voluntary . . . careful and thorough administration of <u>Miranda</u> warnings serves to cure the condition that rendered the unwarned statement inadmissible." <u>Id.</u> at 310-11. The Supreme Court went on to

hold that "subsequent administration of Miranda warnings should suffice" to cure the condition. Id. at 313.

The Supreme Court clarified Elstad almost twenty years later in Seibert. The officers in Seibert intentionally refrained from informing the defendant about her Miranda rights, and, after persuading her to confess, read the Miranda warnings, had her sign a waiver of her rights, and resumed questioning immediately. 542 U.S. 604-05. Although the Supreme Court concluded that the police action was unconstitutional, the court divided 4-1-4, and there was no majority rationale. A plurality held that a court must use a five-factor test to determine whether subsequent, post-Miranda-warning statements are admissible:

1) The completeness and detail involved in the first round of questioning;
2) The overlapping content of the statements made before and after the warning;
3) The timing and setting of the interrogation;
4) The continuity of police personnel during the interrogations; and
5) The degree to which the interrogator's questions treated the second round as continuous with the first.

Id. at 615. Justice Kennedy concurred only in the result, opining that statements should not be excluded unless the police deliberately violated Miranda. Id. at 620.

The Sixth Circuit has not explicitly adopted either Justice Kennedy's concurrence or the plurality's test. See Pacheco-

Lopez, 531 F.3d at 427 n.11 (refusing to "resolve this issue" because the interrogation at issue was inadmissible under both tests, but noting that most circuits have treated Justice Kennedy's concurrence as the controlling precedent).

### 1. The Seibert Plurality

Woodruff does not dispute that the Second Interrogation occurred after he had received a Miranda warning. (Second Objection 5.) He argues, however, that his Second, Third, and Fourth Statements are inadmissible under Seibert and Elstad.

The Second Statement is clearly admissible under the Seibert plurality. After his arrest, in the First Interrogation, Woodruff was asked only one question, how he had obtained the IDs. He made his First Statement then. He was not coerced, the First Interrogation was not detailed, and the only content that overlaps the First and Second Statements is Woodruff's statement that he found the IDs in his girlfriend's car and put them in his pocket. The First Statement was given outside Woodruff's car shortly after he was arrested; the Second Statement was given three hours later at the police station. The Sixth Circuit has held that a time lapse of three hours is sufficient to insulate a subsequent statement. Coomer v. Yukins, 533 F.3d 477, 490 (6th Cir. 2008). It has also held that moving a suspect from the site of his arrest to a police station is a sufficient break in continuity. Id. at 491. "Even

under [] _Seibert_'s plurality test, a reasonable person . . . 'could have seen the station house questioning as a new and distinct experience'" (_id._ at 491) (quoting _Seibert_, 542 U.S. at 615), and "'the _Miranda_ warnings [Woodruff received] could have made sense as presenting a genuine choice on whether to follow up on the earlier admission.'" _Id._ (quoting _Seibert_, 542 U.S. at 615-616).

The two interrogations also addressed different subjects. The Second Interrogation focused on the handgun the police had found in the car. The First asked how Woodruff had obtained other individuals' IDs. The only _Seibert_ factor weighing against the admissibility of the Second Statement is the continuity of police personnel. "[N]one of the facts . . . indicates a police strategy adapted to undermine the _Miranda_ warnings or indicates in any way that a reasonable person . . . would not have understood his constitutional rights." _United States v. McConer_, 530 F.3d 484, 497 (6th Cir. 2008). Woodruff's Second Statement is admissible under the plurality's test in _Seibert_. Because the _Miranda_ warning before the Second Interrogation cured any _Miranda_ defect, the Third and Fourth Statements are admissible as well. _See Elstad_, 470 U.S. at 318 (holding that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he been given . . . _Miranda_

warnings."); <u>United States v. Garreau</u>, 735 F. Supp. 2d 115, 1169-70 (S. Da. 2010) (finding "subsequent statements" admissible when, "after being properly advised of his rights," the defendant's statements were voluntary). Once the police give a defendant in custody a <u>Miranda</u> warning, until the defendant invokes his right to remain silent or his right to counsel, police are free to interrogate him. <u>Davis v. United States</u>, 512 U.S. 452, 458 (1994). "[O]nce [<u>Miranda</u> warnings are properly administered . . . a defendant is left to make his own choice as to how to best proceed." <u>United States v. Plugh</u>, 648 F.3d 118, 125 (2d Cir. 2011).

Although the <u>Miranda</u> warning Woodruff received before the Second Interrogation cleansed the subsequent Interrogations, the Third Statement is independently admissible. The factors the Supreme Court considered in <u>Seibert</u>, 542 U.S. at 615, would weigh in favor of admitting the Third Statement even if the <u>Miranda</u> warning preceding the Second Statement were not curative. The first round of questioning, by Detective Britton shortly after the arrest, was a single question. There was minor overlapping content. The officers at the scene asked how Woodruff had obtained Hispanic IDs. (Detective Britton, 3/24/2011 Hr'g 27.) Sergeant Rosario also asked about the IDs. (Sergeant Rosario, 4/18/2011 Suppression Hr'g 64-67.) To the extent there was overlap, it is minimized by the fact that the

Detectives asked a single question at the scene. See United States v. Phillips, No. 08-96-GFVT, 2008 U.S. Dist. LEXIS 111823, at *33-34 (E.D. Ky. Dec. 31, 2008) (finding no overlap because "prior interviews were short and cursory."). The timing and setting of the interrogations differed. The Third Interrogation took place at the police station fourteen hours after the First Interrogation, not at the crime scene. (Sergeant Rosario, 4/18/2011 Suppression Hr'g 65, 68-69.) The length of time and change of setting are sufficient to cure any taint. Coomer, 533 F.3d at 490-91. There was no continuity of police personnel between the First and Third Interrogations. The First Interrogation was conducted by Detective Britton and the Third by Sergeant Rosario. Seibert, 542 U.S. at 615. The Third Interrogation was not continuous with the First. Sergeant Rosario relied on the Advice of Rights Form given to Woodruff during the Second Interrogation when Woodruff was at the police station; at no point did Rosario rely on the First Statement. (Sergeant Rosario, 4/18/2011 Suppression Hr'g 68-69.) The factors considered by the plurality in Seibert weigh in favor of admissibility.

The Fourth Statement is also independently admissible given the Seibert factors. 542 U.S. at 615. The First Interrogation was a single question. There was little overlap between the First and Fourth Interrogations. During the Fourth

Interrogation, Woodruff confessed to participating in the robbery of several Hispanic individuals, using a firearm in the robbery, and seeking money to pay a debt for marijuana he had lost. (Sergeant Rosario, 3/24/2011 Suppression Hr'g 68-73.) The content of the Fourth Statement significantly differs from the First Statement, in which woodruff was responding to a single question about how he had obtained the IDs. (Detective Britton, 3/24/2011 Suppression Hr'g 28.) The timing and setting were different. The Fourth Interrogation took place on April 7, two days after the First Interrogation and at the police station as opposed to the Kensington Apartments. (Sergeant Rosario, 3/24/2011 Suppression Hr'g 65.) Sergeant Rosario, not Detective Britton, conducted the Fourth Interrogation. (Id.) Rosario provided Woodruff with a separate statement of rights and did not treat the Fourth Interview as continuous with the First. (Id. 66.) The Fourth Statement is independently admissible.

Woodruff's final contention is that Maryland v. Shatzer, 130 S. Ct. 1213 (2010), requires fourteen days between an initial interrogation and any subsequent interrogation to eliminate any coercive effect. Woodruff misconstrues Shatzer, which addressed how long police must refrain from interrogating a defendant who properly invoked his right to counsel and who had been released from custody. Id. at 1223. The Supreme Court in Shatzer addressed the possibility that "a suspect may

be coerced or badgered into abandoning his earlier refusal to be questioned without counsel." Id. at 1220. The court reaffirmed that "Miranda announced that police officers must warn a suspect prior to questioning that he has a right to remain silent . . . [and] if the suspect indicates that he wishes to remain silent, the interrogation must cease." Id. at 1219. The court concluded that the right to remain silent does not last indefinitely. Id. "When . . . a suspect has been released from his pretrial custody and has returned to his normal life . . . there is little reason to think that his change of heart regarding interrogation has been coerced" because "[h]e has likely been able to seek advice from an attorney." Id. at 1221. Shatzer does not address the situation here, where an initial failure to provide a Miranda warning was followed by a subsequent warning and a second statement. The Supreme Court does not discuss or express any intent to overturn Elstad or Seibert. Shatzer does not control this case.

Woodruff never alleges that he invoked his right to counsel or to remain silent. He was never released from custody. Any coercive effect of the First Interrogation was cured by the Miranda warning he was given before the Second Interrogation hours later in a different location and by subsequent warnings before subsequent interrogations. See McConer, 530 F.3d at 497.

Woodruff's Statements are admissible under the plurality's test in Seibert.

## 2. Justice Kennedy's Analysis in **Seibert**

Justice Kennedy's concurrence in Seibert requires two steps. First, it directs the court to determine whether there was a deliberate violation of Miranda. Seibert, 542 U.S. at 622. Second, if there was no deliberate violation, the court applies Elstad and decides whether statements made after a Miranda warning are admissible based on whether they were knowingly and voluntarily made. Id.

There is no evidence of a deliberate violation here. The Detectives asked Woodruff a single, natural question during the First Interrogation. They asked no further questions until Woodruff had received his Miranda warning. That contrasts with cases where the Sixth Circuit has found a deliberate violation of a defendant's Miranda rights. In Dixon v. Houk, for example, police officers "engaged in a thirty minute interrogation" before beginning to record a defendant. 627 F.3d 553, 557-58 (6th Cir. 2010). The police also promised a "deal to avoid the death penalty in return for a confession . . . a high-pressure tactic designed to override" a defendant's commitment to his Miranda rights. Id. at 558.

In Seibert, Justice Kennedy found that an "unwarned interrogation . . . conducted in the station house," with

"systematic, exhaustive [questions] managed with psychological skill" was a deliberate violation of Miranda. Seibert, 542 U.S. at 616. The First Interrogation was nothing like that. In contrast to Seibert, where "there was little, if anything of incriminating potential left unsaid," almost all of the evidence on which the Government relies here comes from the post-Miranda Interrogations. Id. If the police had deliberately intended to violate Woodruff's Miranda rights, they would have questioned him extensively. They did not. This case is more analogous to McConer, where the Sixth Circuit found that "a good-faith Miranda mistake," which was followed by giving the defendant a Miranda warning, did not violate his Miranda rights. McConer, 530 F.3d at 498.

Courts have identified several factors that indicate whether police deliberately withheld Miranda warnings. These include:

1) Whether the police department had an official policy of directing officers to withhold Miranda warnings;
2) Whether coercive or improper police tactics were used;
3) Whether there was a change in setting;
4) The lapse in time in questioning; and
5) The overlap in content between questioning.

See United States v. Flack, No. 3:08-CR-108, 2009 U.S. Dist. LEXIS 116136, at *42-43 (E.D. Tenn. Dec. 11, 2009) (collecting authorities and identifying factors courts have used to determine whether the police had a deliberate policy). In the

case at hand, there was a lapse in time, a change in setting, and little overlap in the content of questioning.  Woodruff has also failed to offer evidence of police coercion or an official police policy of withholding Miranda warnings.

Under Justice Kennedy's analysis, a court should apply Elstad if there was no coercion or deliberate violation of a defendant's Miranda rights.  Siebert, 542 U.S. at 622.  Where, as here, a prior statement was "unwarned but clearly voluntary . . . careful and thorough administration of Miranda warnings serves to cure the condition that rendered the unwarned statement inadmissible."  Elstad, 470 U.S. at 310-11.  Although this Court must "examine the surrounding circumstances" to determine whether Woodruff's post-Miranda statements were voluntary, "[t]he fact that a suspect chooses to speak after being informed of his rights is . . . highly probative."  Id. at 318.

Coomer v. Yukins demonstrates the difficulty of suppressing post-Miranda statements in the absence of coercion.  533 F.3d at 491.  The defendant in Coomer confessed when nine to eleven police officers appeared at her apartment and talked to her before she had received a Miranda warning.  Although the defendant's first statement was excluded, her second, given several hours later at the police station, was admissible

because she had received "complete <u>Miranda</u> warnings and offered her second [statement] in different circumstances." <u>Id.</u> at 491.

Woodruff cites <u>Pacheco-Lopez</u> to support his Motion to Suppress, but the facts in <u>Pacheco-Lopez</u> are significantly different. 531 F.3d at 429. In <u>Pacheco-Lopez</u>, the defendant was interrogated immediately after being arrested, asked several questions, and then given his <u>Miranda</u> warning and interrogated further. <u>Id</u>. at 422-23. "There was no change in the time or place of the interrogation." <u>Id</u>. at 429. Those circumstances differ materially from this case, where Woodruff was interrogated several hours later on a different subject at a different location. <u>See</u> <u>Neal v. Booker</u>, No. 05-CV-74000, 2009 U.S. Dist. LEXIS 45293, at *26 (E.D. Mich. May 29, 2009) (admitting statements obtained, although there was an initial <u>Miranda</u> violation, when defendant was not threatened or abused, was permitted to use the bathroom, and time had passed between the first statement and the second, post-<u>Miranda</u> statement).

The <u>Miranda</u> warning before the Second Interrogation, given in a non-coercive atmosphere, to an individual who knowingly and voluntarily waived his rights, cured whatever defect flowed from the First Interrogation. All of the Statements after the <u>Miranda</u> warning are admissible because, until a defendant invokes his right to remain silent or his right to counsel, police are free to interrogate him. <u>Davis</u>, 512 U.S. at 458.

As Justice Kennedy recognized, "it would be extravagance to treat the presence of one statement that cannot be admitted under _Miranda_ as sufficient reason to prohibit subsequent statements preceded by a proper warning." _Seibert_, 542 U.S. at 520.

The Third and Fourth Statements are independently admissible as well. Sergeant Rosario reminded Woodruff that the _Miranda_ warning he had received before the Second Interrogation was still in effect. (Sergeant Rosario, 4/18/2011 Suppression Hr'g 68-69.) Woodruff was advised of his rights and given an Advice of Rights Form before the Fourth Interrogation. (Sergeant Rosario, 3/24/2011 Suppression Hr'g 65.) There is no indication that his Statements were solicited as part of a deliberate plan to violate _Miranda_; rather, Sergeant Rosario's actions demonstrate scrupulous respect for Woodruff's _Miranda_ rights. Woodruff's Third and Fourth Statements are admissible under Justice Kennedy's analysis.

**IV.  Conclusion**

For the foregoing reasons, Woodruff's objections are not well taken. The Court ADOPTS the Reports and Recommendations of the Magistrate Judge and DENIES the Motions to Suppress. All findings and conclusions of the Magistrate Judge not discussed above have not been specifically objected to and are ADOPTED.

So ordered this 17th day of November, 2011.

/s Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE